# Reed's Appeal.

1. A local Act the purpose of which is to repeal a general Act as to a certain county, is wholly nugatory where said Act has already been repealed by a general Act.

2. The local Act of February 20th, 1867, P. L. 226, repealing the Act of April 7th 1830, or any other Act authorizing the county treasurer of Washington county to grant a license to vend intoxicating liquors by the quart, is wholly nugatory, for by Act of March 31st, 1856, P. L., 200, the power to grant licenses to vend intoxicating liquors by the quart was exclusively vested in the Court of Quarter Sessions.

3. The action of the Court of Quarter Sessions of the Peace in granting a license to sell liquor cannot be reviewed by the Supreme Court, it being a matter in the discretion of the court below, from which no appeal has been given to said court.

4. The petitions for and against granting a license to sell liquor are not matters of record, but in the nature of evidence for the information of the conscience of the court, and, as a consequence, the Supreme Court cannot review them or reverse the action of the Court of Quarter Sessions of the Peace as to the granting a license to sell liquor, on a *certiorari*.

October 20th, 1886. Before GORDON, PAXSON, TRUNKEY, STERRETT, GREEN and CLARK, JJ. MERCUR, C. J., absent.

APPEAL from the Court of Quarter Sessions of the Peace of *Washington county :* Of October Term, 1886, No. 137.

CERTIORARI to said court to bring up the record in case appealed : Of October Term, 1886, No. 150.

The following are the facts of the case as they appeared on the hearing before the court, HART, P. J.

On April 27th, 1886, Julius B. Clark filed the following petition, verified by his affidavit :

The petition of Julius B. Clark respectfully represents : That he is a citizen of the United States, of temperate habits and good moral character; that it is necessary for the accommodation of the public and the citizens of Washington, Pennsylvania, and vicinity, that liquors be sold in the said borough of Washington, in quantities less than a gallon. He therefore prays your honor to grant him license to sell, in the storeroom of Jacob Miller, at No. 122 South Main Street, in said borough, vinous, spirituous, malt and brewed liquors, and admixtures thereof, with or without other goods, wares and merchandise, in quantities not less than a quart.

We, the undersigned, join in the prayer of the above peti-

tion, and agree to become the sureties of the said petitioner should the license prayed for be granted.

WM. WORKMAN,
JOHN SLATER.

The said Workman and Slater, with twelve others, made the following certificate, which was attached to said petition and filed with it.

We, the undersigned, who are citizens of Washington, Pennsylvania, in which place the above-named Julius B. Clark petitions for license to vend liquors in quantities not less than a quart, do hereby certify that we are personally acquainted with the petitioner, and know him to be a citizen of the United States whose habits are temperate, and character good. And we further certify that in our opinion and from our knowledge of him, he is a proper and safe person to be licensed to vend liquors, and in the conduct of said business would observe the letter and spirit of the laws relating thereto.

On May 6th, 1886, about seven hundred citizens filed the following supplementary petition :—

The petition of the undersigned citizens of Washington, Pa., and vicinity, respectfully represents : That they are informed that Julius B. Clark, a citizen of said borough, will present his petition to your honor at May Term, 1886, of the Court of Quarter Sessions aforesaid, for license to sell in the borough of Washington, Pa., vinous, spirituous, malt and brewed liquors, with or without other goods, wares and merchandise, in quantities not less than one quart. That in their judgment it is necessary for the accommodation of the public and the citizens of Washington, Pa., and vicinity, that the application of the said Julius B. Clark be granted. They therefore pray your honor to grant him the license prayed for.

On May 8th, 1886, 530 voters and male citizens of the borough of Washington filed the following remonstrance :

Your petitioners emphatically deny that any such necessity exists for the accommodation of the public and the citizens of Washington and vicinity, and they do earnestly protest and remonstrate against the granting of the said license, for the following reasons, to wit : Here follow the reasons at length, which were social, economical, moral and religious in their nature.

On May 10th, 1886, a like remonstrance of sixty-three other male citizens was filed.

On May 11th, 1886, a like remonstrance of thirty-six members of the temperance league was filed.

On May 12th, 1886, a like remonstrance of fifteen clergymen was filed.

On May 15th, 1886, a like remonstrance of the faculty of Washington and Jefferson College, nine in number, was filed.

On May 18th, 1886, a like remonstrance of 1498 women was filed.

On the same day a like remonstrance of 118 members of the Washington Female Seminary was filed.

On May 31st, after hearing, the court granted the license as prayed for, filing the following opinion:

The application in this case has been duly advertised. The papers are regular and in substantial compliance with the Act of Assembly. The evidence is uncontroverted, that the applicant is a citizen of the United States, a resident of the borough of Washington, and a man of temperate habits and good moral character; and the bond filed is in due form, and the sureties are substantial.

But the application is met with a remonstrance, signed by men and women of the borough and vicinity to the number of about two thousand. On the other hand it is supported by the petition in its favor of more than seven hundred of those who are represented as legal voters, resident within the same limits.

These petitions for and remonstrances against the application are made, in a sense, legal evidence by the Act of Assembly—at least the court is bound to receive them, and to allow them such weight as they are fairly entitled to.

It is claimed by the remonstrants, that, as the granting or refusal of a license is within the discretion of the court, the judge may refuse to grant, upon such merely moral, social and economic considerations as convince his judgment that a license to vend intoxicating liquors as a beverage cannot be taken to be a necessity in any supposed case whatever, but is and must be, in every case, wholly unnecessary, and productive of unmixed evil. But the proposition, considered with reference to the legal discretion of the court in such cases, is untenable. If it be so that the court has an arbitrary discretion to grant or refuse licenses, without limitation or control, then, as was well observed in a recent case by the president judge of the 28th judicial district, it is in the power of the fifty or sixty quarter sessions' judges of the state, outside of the large cities, to practically abrogate the license laws entirely; to substitute in their place a prohibitory law or regulation of their own, and thereby set themselves up above the only constitutional law-making power of the Commonwealth.

But the nature of the discretion entrusted to the courts in such cases has been defined by the Supreme Court in Schlaudecker *v.* Marshall, 22 P. F. Smith, 200. In order to properly understand that case it is necessary to briefly outline the facts

as officially reported. By special Act of May 10th, 1871, the Court of Quarter Sessions of Erie county was required to appoint annually a board of licensers, with the same authority to grant licenses as the Court of Quarter Sessions had. Schlaudecker, among others, had filed his petition in due form for an eating-house license, and a proper bond, conditioned according to law. The board declined to grant the license. Schlaudecker then obtained a rule from the Court of Common Pleas on the board to show cause why a writ of mandamus should not issue to compel them to grant him a license. The board, in response to the rule, showed, *inter alia*, that there were before them, at the time they refused license to Schlaudecker, thirty-one applications for tavern license, eight for wholesale liquor license, and ninety-five for eating-house license; of which the board granted twenty-five tavern licenses, six wholesale liquor licenses, and thirty-nine eating-house licenses, and they say: "Judging that they had granted a sufficient number of licenses in those different branches to accommodate the public and entertain strangers and travelers, the respondents did adjudicate upon said application (Schlaudecker's, to wit), and refused the same." The Court of Common Pleas, after hearing, discharged the rule and refused to grant the mandamus; and thereupon Schlaudecker sued out a writ of error. The opinion of the Supreme Court, affirming the action of the Common Pleas, was delivered on the 6th of January, 1873—the law being the same then as now in regard to the question of the discretion vested in the courts in regard to the granting and refusal of licenses—the Act of 1875 having, in my judgment, made no change in that respect.

On "the nature and true character of the discretion to be exercised by the court," Judge Agnew says: "No subject has been productive of more difference of opinion and practice than this in the different judicial districts of the state; some judges holding it to be obligatory on the court to grant every license where the applicant has brought himself within the provisions of the law as to the terms of his application, and others holding, that they are not bound to grant license in any case whatsoever. Clearly, neither opinion is right; the discretion which the court exercises being a sound discretion upon the circumstances of each case as it is presented to the court, and not a general opinion upon the propriety or impropriety of granting licenses."

"Whether any or all licenses should be granted is a legislative and not a judicial question. Courts sit to administer the law fairly as it is given to them, and not to make or repeal it. The law of the land has determined that licenses shall exist, and has imposed upon the court the duty of ascertaining the

proper instances in which the licenses shall be granted, and therefore, has given it to the court to decide upon each case as it arises in due course of law. The act of deciding is judicial and not arbitrary or wilful. The discretion vested in the court is, therefore, a sound judicial discretion, and to be a rightful judgment, it must be exercised in the particular case and upon the facts and circumstances before the court, after they have been heard and duly considered: in other words, to be exercised upon the merits of each case, according to the rule given by the Act of Assembly. To say that I will grant no license to any one, or that I will grant it to every one, is not to decide judicially on the merits of the case, but to determine beforehand without a hearing, or else to disregard what has been heard. It is to determine, not according to law, but outside of law, and it is not a legal judgment, but the exercise of an arbitrary will."

That the nature of the discretion, thus clearly defined by Judge AGNEW has not, in the opinion of the Supreme Court, been changed by the Act of 1875, is apparent from Toole's Appeal, 9 Nor., 376, decided in June, 1879.

In the case before us the evidence is, on the one side, that there is no place within the county where liquors can now be lawfully sold, as a beverage, in less quantities than one gallon. On the other hand it is objected that there is no necessity for a quart license in this borough, or in any other part of the county; that the granting of such license will be productive of great and deplorable evils, and the court is asked by a very large number of citizens generally, and especially by ministers of the gospel, representing nearly all the churches of the town, by the faculty of the College, by the representatives of the Female Seminary, by the members of the Washington Temperance League, and by others, to reject this application and save the community from a flood of evils which will, as they believe, surely follow the granting of the license prayed for. All these classes are certainly entitled to be heard, and, in fact, their objections and remonstrances have received the most anxious and respectful consideration. But their reasons for remonstrance are, in my opinion, such as address themselves to the conscience and judgment of the legislature, rather than to the judicial discretion of the court. They furnish us with most weighty and convincing reasons why the existing state of the law in relation to quart licenses should be repealed; but, I regret to say, they do not, in my judgment, present any reason why, under the law as it now is, this license should not be granted. As the law now stands, it distinctly recognizes the right of the people to use intoxicating liquors as a beverage and for domestic uses. The same law provides, among other

things, for the granting of quart licenses to accommodate the public. There is at present no such license extant in the county. More than half the voters resident in the town, and many in the vicinity, have signed petitions asking that such license be now granted. The applicant appears to be a proper person with whom to intrust such license, and his papers are all in substantial compliance with the law. There is therefore, in law, no good reason why the court, in the exercise of a judicial—not arbitrary—discretion, should not direct the license to issue.

At the argument of this cause our attention was directed by counsel for remonstrants to the special Acts of 1867 for this county, as bearing upon the questions both of discretion and authority. The first of these Acts is that of January 14th, 1867, P. L. 190, which provides that the Quarter Sessions of this county shall not be compelled to grant any tavern license "unless satisfied that the granting of the same would be for ·the good of the people and promote the public welfare." As this Act relates exclusively to tavern licenses, I am at a loss to perceive how, on any fair rule of interpretation, it can be construed so as to enlarge the discretion of the court in regard to the granting or refusing of quart licenses.

In point of fact, it is apparent that the gentleman who drafted the bill, the late Joseph Henderson, Esq., of this bar, could not have had the subject of quart licenses in his view; for, in common with many others of that time, he was laboring under the erroneous impression that under the law, as it then stood, the granting of licenses to sell by the quart in this county was vested in the county treasurer. Consequently he, a few days later, had passed the special Act of February 20th, 1867, P. L. 226, which provides that so much of any Act or Acts as "authorizes the treasurer of Washington county to grant a license to vend any intoxicating liquors by the quart or greater quantity, be and the same is hereby repealed." Of course this was an entirely nugatory piece of legislation; it was merely a "blow in the air," and accomplished nothing; and hence it is, to my mind, perfectly clear that it did not operate to take from the Quarter Sessions of the county the power, then and ever since entrusted to it, to grant quart licenses.

Upon the whole case I am of opinion that the license prayed for should be granted, and it is so ordered.

A formal decree was entered granting said license, whereupon A. M. Reed and other remonstrants took these writs and filed the following assignments of error:—

1. The court erred in the conclusion drawn in regard to

the special Act of February 20th, 1867, P. L. 226, that "this was an entirely nugatory piece of legislation. It was merely 'a blow in the air' and accomplished nothing, and hence it is, to my mind, perfectly clear that it did not operate to take from the Quarter Sessions of the county the power, then and ever since entrusted to it, to grant quart licenses."

2. The court erred in refusing consideration to the remonstrances, because "they do not, in my judgment, present any reason why, under the law as it now is, this license should not be granted."

3. The court erred in neglecting and refusing to exercise the discretion and judgment required by the Act of 22d of March, 1867, P. L., page 40; Purdon, page 1080, place 33.

4. The court erred in making the following decree:—

And now, June 14th, 1886, this case came on to be heard and was argued by counsel, whereupon it is ordered, adjudged and decreed that the prayer of the petition is granted, the bond of the petitioner is approved, and the clerk of the Court of Quarter Sessions, of the county of Washington is directed, upon the presentation to him of the receipt of the county treasurer for fifty dollars by the said petitioner, to issue to the said Julius B. Clark a license to vend, at the store room of Jacob Miller, No. 122 South Main street, Washington, Pa., vinous, spirituous, malt and brewed liquors, and admixtures thereof, with or without other goods, wares and merchandise, in quantities not less than a quart.

5. The court erred in arriving at the conclusion that the papers of the petitioner "are all in substantial compliance with the law," for the reason that the word "moral" is left out of the certificate of good character.

*Aiken* (*A. W. & M. C. Acheron*, *J. P. Sayer* and *Duncan* with him), for appellants.

1. The special Act of February 20th, 1867, P. L., 226, repealing the Act of April 7th, 1830, or any other Act authorizing the treasurer of Washington county to grant a license to vend intoxicating liquors by the quart, must be construed to give it effect.

The court below held it to be a nugatory piece of legislation, a blow in the air, and this because the Act of March 31st, 1856, P. L. 200, the powers of quart licenses was vested exclusively in the Court of Quarter Sessions.

What was the meaning and intention of the legislature in passing the special Act of 1867. "Statutes are to be construed so as may best effectuate the intention of the makers, which sometimes may be collected from the cause or occasion of passing the statute and, when discovered, it ought to be fol-

[Reed's Appeal.]

lowed with judgment and discretion in the construction, though that construction may seem contrary to the letter of the statute:" Big Black Creek Improvement Co. v. Commonwealth, 13 Norris, 455. "For the rule is, that a statute shall be so construed as that it may all stand and no part be rejected or declared inoperative:" Ihmsen v. Monongahela Navigation Co., 8 Casey, page 157. "Words which are plain enough in their ordinary sense may, when they would involve any absurdity or inconsistency or repugnance to the clear intention of the legislature, to be collected from the whole of the Act or Acts *in pari materia* to be construed with it, or other legitimate grounds of interpretation, be modified or altered so as to avoid that absurdity, inconvenience or repugnance, but no further: Miller v. Soloman, 7 Exch., 546. "The best exponents of the legislative mind are the words of the statute, where they are free from ambiguity. But where they are not, we must resort to legislation on kindred subjects, the spirit of our institutions and the habits of the community, to discover the intent of the legislature:" Com. v. Penn'a Insurance Co., 1 Harris, page 166. Following the suggestions of the last citation, an examination of the special Acts of the legislature of the years 1866 and 1867 will disclose a desire on the part of the citizens of certain counties to lessen the evils arising out of the license system, and also a strange and unaccountable ignorance on the part of the legislature of the condition of the license laws. It is evident that the intention of the legislature was to comply with a popular demand for a restriction of the whole license system. See Acts of 1866, pages 333, 337, 339, 560, 658, 679, 735 and 896; Acts of 1867, pages 40, 190, 226, 229, 372, 440, 591, 731, 740, 825, 893, 1178, 1288. These various Acts show that the legislature was besieged with applications to restrict and abolish the license system. Washington county was not behind in this movement. At page 190, P. L., 1867, we find an Act that declares that the Acts in force in regard to tavern licenses " shall not be so construed as to compel the Court of Quarter Sessions of Washington county to grant any tavern license unless the court is satisfied that the granting of the same would be for the good of the people and promote the public welfare." Under this Act the discretion vested in that court is wider than in any other court in the state. Now the same legislature, at page 226, passed the Act forbidding the treasurer of the county to issue quart licenses, and at page 893 passed an Act for Mercer county, transferring to the Quarter Sessions the power to grant quart licenses. It is evident that there was a misapprehension as to where the power lay, but it is manifest that it was the purpose of the Act, on page 226, to abolish quart licenses in Washington county.

· "A remedial Act shall be so construed as most effectually to meet the beneficial end in view and to prevent a failure of the remedy:" Dwarris on Statutes, p. 718. "There can be no question that the words of a remedial statute are to be construed largely and beneficially, so as to suppress the mischief and advance the remedy. 'It is by no means unusual, in construing a remedial statute,' says a late case "to extend the enacting words beyond their natural import and effect, in order to include cases within the same mischief:'" Id. p. 735.

We submit that the court below should have construed the special Act of 1867, page 226, as prohibiting quart licenses in our county, and refused to grant the license prayed for. It is the only way in which that Act can be given effect, and is in accord with its spirit and meaning.

2. The Act of March 22d, 1867, P. L. 40, imposes on the court the duty of comparing the names and character of the signers of the petitions for and against the license, and of refusing the license if the weight of names and character showed there was no necessity for the license. It is manifest that the legislature, instead of grasping the evil of intemperance, and passing the laws demanded by public sentiment, threw the burden on the Courts of Quarter Sessions, and on the people, requiring the courts to refuse license in all cases in which public sentiment, embodied in remonstrances, was against the granting of license, and denied the necessity of license in any particular application. The petitions for license assert its necessity; the petitions against license deny its necessity. The issue is made up and the court decides the case, "having due regard to the number and character of the petitioners for and against such application." Did the court so decide in this case? It allowed the assertion of the petitioners that the license was necessary, to stand as verity, but imposed on the remonstrants the duty of giving good reasons for the denial of the necessity of the license, and none, in the opinion of the court, being given, the remonstrances were disregarded for that reason. The court says: "But their reasons for remonstrance are, in my opinion, such as address themselves to the conscience and judgment of the legislature rather than to the judicial discretion of the court. They furnish us with most weighty and convincing reasons why the existing state of the law in relation to quart licenses should be repealed, but I regret to say, they do not, in my judgment, present any reason why, under the law as it now is, this license should not be granted."

The court quotes quite extensively from the opinion of this court in Schlaudecker *v.* Marshall, 22 Smith, 200, and we would have no legal ground of complaint if the court below had exercised its legal discretion, weighed the names and char-

acter of the petitioners pro and con, and granted the license.
Our complaint is that the court did not exercise its legal dis-
cretion under the Act of March 22d, 1867, by deciding the
necessity of the license on the weight of names and charac-
ter. If the Court had said, "Having due regard to the num-
ber and character of the petitioners for and against this
application, I am of the opinion that this license is necessary,"
we could not complain. Not having done so, we ask this
court to reverse the judgment of the court below for that rea-
son, and because the special Act cited above forbids the grant-
ing of quart licenses in Washington county.

We call attention, without argument, to the fifth assignment
of error. The Act of 1858, Purdon, page 1078, place 17, pro-
vides that licenses shall be granted to citizens of the United
States of temperate habits and good moral character. The
certificate of the petitioner, signed by twelve citizens, leaves
out the word "moral."

*J. M. Braden* for appellee.—The Act of February 20th,
1867, is plain and unambiguous. Its construction is simple.

"We are to look at the words in the first instance, and when
they are plain, to decide on them:" Leonard *v.* Commonwealth
ex rel. Cassidy, 2 Amerman, 607.

When the words are plain, the best rule to arrive at the
meaning of the legislature is, to abide by them in their ordi-
nary meaning and import, for they are the best exponents of
the legislative mind: Commonwealth *v.* Penn. Ins. Co., 1 Har-
ris, 166.

The complaint that the court erred in "neglecting and re-
fusing to exercise the discretion and judgment required by the
Act of 22d of March, 1867, P. L., 40," is not well founded.
The error into which counsel for appellants have fallen is, that
the court must determine the necessity of the license from the
number and character of the petitioners for and against the
application alone. If the courts of the Commonwealth were
bound down to this single method of determining the neces-
sity for a license, then affidavits that a dozen similar places
existed in the locality for which the license is asked could not
be considered. The authority given the court to hear peti-
tions in addition to that of the applicant, in favor of, and re-
monstrances against the application for license, certainly does
not prevent the court from hearing and considering other evi-
dence. The Act of 1875, 2 Pur.d Dig., page 1077, place 15,
expressly provides that: "All persons applying or making
objections to applications for licenses, may be heard by evi-
dence, petition, remonstrance or counsel."

In Schlaudecker *v.* Marshall, 72 Penn. St. R., 203, this court held, that an ascertainment of the necessity of the house for public accommodation as a hotel or eating house "involves the number of each in the particular locality." The same rule would apply to applications similar to the present one.

It may be fairly doubted if the Act of 22d of March, 1867, P. L. 40, applies to quart licenses. The language of the first section indicates that its provisions were intended to apply to licenses to sell "intoxicating drinks," in other words, to licenses authorizing sales by the drink. The courts are authorized by this section to refuse applications for license where "such license is not necessary for the accommodation of the public and entertainment of strangers and travelers." A quart license does not authorize sales of intoxicating liquors by the drink, and the place of sale is not a place for the entertainment of strangers and travelers.

Consideration of the second, third and last assignments of error involves a review, by this court, of the action of the court below upon the merits of the case. This court has heretofore declined to review on *certiorari* the merits of the case, and has decided in a late case, (Toole's Appeal, 9 Norris, 376) that the Act of Assembly gives no appeal in such a case, the grant or refusal of a license being entirely within the discretion of the court below.

It is well settled that error cannot be assigned for matters in the discretion of the court below: Dubois *v.* Glaub, 52 Penn. St. R., 238; Waldron *v.* Waldron, 55 Id., 231; Pringle *v.* Pringle, 59 Id., 281.

The second, third and last assignments are assignments of portions of the opinion of the court for error. We do not see how this court can consider them.

A *certiorari* only brings up the record for review. The opinion of the court is no part of the record. This court only examines the regularity of the proceedings, and cannot look into the evidence, though incorporated in the opinion of the court: Shenango *v.* Wayne, 34 Penn. St. R., 184; Church Street, 54 Ibid, 353; In re Kensington, &c., Turnpike Co., 1 Out., 260.

Relative to the last assignment of error, we desire to say further that the Act of 1856 does not require a certificate from applicants for quart licenses, similar to the one required of applicants for tavern license.

The opinion of the court was filed November 1st, 1886.

PER CURIAM.—It is probable that the framer of the Act of the 20th of February, 1867, intended thereby to prevent altogether the granting of licenses to sell intoxicating liquors by

the quart in the county of Washington, but if so, he made a serious mistake, for the statute, as framed, is wholly nugatory. The Act of 1856 had already deprived the treasurer of the power to grant such licenses, and had vested it in the Quarter Sessions, so that the Act of 1867 had nothing on which to operate, and was, therefore, as we have said, of no validity.

The action of the court in granting the license complained of, is something that we cannot review, that being a matter of discretion, though we are satisfied that there was a misapprehension of the intent of the Act of the 22d of March, 1867.

The legislative mind is therein very clearly expressed, and ought not to be mistaken. The court is to hear petitions in addition to that of the applicant in favor of, and remonstrances against the application for such license, and in all cases to refuse the same whenever, in the opinion of the court, having due regard to the number and character of the petitioners for and against such application, such license is not necessary for the accommodation of the public, and entertainment of strangers and travellers. In this we see, that the petitions and remonstrances are for the sole purpose of determining, without regard to the character of the applicant, whether such license is, or is not, a matter of public necessity. Furthermore, the legislature has prescribed the method by which this necessity shall be ascertained, that is, by the number and character of those petitioning for or against such application. We may also here call attention to the fact that the remonstrance, as well as the additional petition, must be special, not general; that is, for or against a single, or particular application, otherwise it may be disregarded. In the case in hand the remonstrance conforms to the Act, so that no objection can be taken to it in that respect. But the Act does not require that either the petitioners or remonstrants should be voters; it is enough that they be citizens, whether male or female, hence, it is a mistake to pass over women, and count only voters. The Act is a valuable one if properly administered, but whether it was so administered in this case, we cannot determine. The petitions, pro and con, are not matters of record, but in the nature of evidence for the information of the conscience of the court, and, as a consequence, we cannot review them, or reverse the action of the judge of the Quarter Sessions on a *certiorari*. Moreover, as no appeal has been given, we have no power to take cognizance of the complaint of the appellants.

　　　　　　　Decree affirmed, and appeal quashed.